

**FILED**

SEP 19 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

# United States Court of Appeals
## for the Fifth Circuit

Certified as a true copy and issued
as the mandate on Sep 19, 2025

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

No. 24-50826

5:21-cv-844-XR

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2025

Lyle W. Cayce
Clerk

---

LA UNION DEL PUEBLO ENTERO; SOUTHWEST VOTER
REGISTRATION EDUCATION PROJECT; MEXICAN AMERICAN BAR
ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION; JOLT ACTION; WILLIAM C.
VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED;
FRIENDSHIP-WEST BAPTIST CHURCH; TEXAS IMPACT; JAMES
LEWIN; MI FAMILIA VOTA;

*Plaintiffs—Appellees,*

*versus*

GREGORY W. ABBOTT, *in his official capacity as Governor of Texas*;
WARREN K. PAXTON, *in his official capacity as Attorney General of Texas*;
STATE OF TEXAS; JANE NELSON, *in her official capacity as Texas
Secretary of State*; HARRIS COUNTY REPUBLICAN PARTY; DALLAS
COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN
SENATORIAL COMMITTEE; SEAN TEARE, *Harris County District
Attorney,*

*Defendants—Appellants,*

REPUBLICAN NATIONAL COMMITTEE

*Movant—Appellant,*

---

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF
TEXAS,

No. 24-50826

*Plaintiffs- Appellees,*

*versus*

KEN PAXTON, *Texas Attorney General,*

*Defendant—Appellant,*

_____

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS;
TEXAS AFT; VOTE LATINO,

*Plaintiffs—Appellees,*

*versus*

KEN PAXTON, *in his official capacity as the Texas Attorney General,*

*Defendant—Appellant,*

_____

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF
TEXAS,

*Plaintiffs-Appellees,*

*versus*

GREGORY WAYNE ABBOTT, *in his official capacity as the Governor of
Texas*; WARREN KENNETH PAXTON, JR., *in his official capacity as the
Attorney General of Texas,*

*Defendants-Appellants.*

No. 24-50826

---

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 1:21-CV-780, 1:21-CV-786,
5:21-CV-844, 5:21-CV-848, 5:21-CV-920

---

### JUDGMENT

Before SMITH, GRAVES, and DUNCAN, *Circuit Judges*.

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED, the permanent injunction of §§ 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04 is VACATED, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that Appellees pay to Appellants the costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See FED. R. APP. P. 41(B). The court may shorten or extend the time by order. See 5TH CIR. R. 41 I.O.P.

# United States Court of Appeals
# for the Fifth Circuit

---

No. 24-50826

5:21-cv-844-XR

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2025

Lyle W. Cayce
Clerk

La Union del Pueblo Entero; Southwest Voter
Registration Education Project; Mexican American Bar
Association of Texas; Texas Hispanics Organized for
Political Education; JOLT Action; William C.
Velasquez Institute; Fiel Houston, Incorporated;
Friendship-West Baptist Church; Texas Impact; James
Lewin; Mi Familia Vota;

*Plaintiffs—Appellees,*

*versus*

Gregory W. Abbott, *in his official capacity as Governor of Texas*;
Warren K. Paxton, *in his official capacity as Attorney General of Texas*;
State of Texas; Jane Nelson, *in her official capacity as Texas
Secretary of State*; Harris County Republican Party; Dallas
County Republican Party; National Republican
Senatorial Committee; Sean Teare, *Harris County District
Attorney*,

*Defendants—Appellants,*

Republican National Committee

*Movant—Appellant,*

---

OCA-Greater Houston; League of Women Voters of
Texas,

*Plaintiffs- Appellees,*

*versus*

KEN PAXTON, *Texas Attorney General,*

*Defendant—Appellant,*

—————————————

LULAC TEXAS; TEXAS ALLIANCE FOR RETIRED AMERICANS; TEXAS AFT; VOTE LATINO,

*Plaintiffs—Appellees,*

*versus*

KEN PAXTON, *in his official capacity as the Texas Attorney General,*

*Defendant—Appellant,*

—————————————

DELTA SIGMA THETA SORORITY, INCORPORATED; THE ARC OF TEXAS,

*Plaintiffs-Appellees,*

*versus*

GREGORY WAYNE ABBOTT, *in his official capacity as the Governor of Texas;* WARREN KENNETH PAXTON, JR., *in his official capacity as the Attorney General of Texas,*

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:21-CV-780, 1:21-CV-786,
5:21-CV-844, 5:21-CV-848, 5:21-CV-920

Before SMITH, GRAVES, and DUNCAN, *Circuit Judges.*

STUART KYLE DUNCAN, *Circuit Judge*:

We consider challenges to various provisions of Texas's Senate Bill 1 ("S.B. 1") that regulate how persons may assist voters in casting ballots. Several voter-assistance organizations claimed those provisions are preempted by Section 208 of the Voting Rights Act, 52 U.S.C. § 10508 ("VRA Section 208" or "Section 208"). The district court agreed and permanently enjoined the challenged provisions.

We reverse.

Some of the challenged provisions (§§ 6.03, 6.05, and 6.07) require assistors to disclose information such as name, address, relationship to the voter, and whether they are compensated. Another (§ 6.04) amends the existing oath assistors must take. Contrary to the district court's ruling, we conclude that none of the plaintiff organizations has standing to challenge these provisions. In particular, fears that their members will be prosecuted for violating them are speculative and so fail to show Article III injury.

Other challenged provisions (§§ 6.06 and 7.04) bar assistance from persons who are compensated or who are paid ballot harvesters. The district court correctly ruled that two of the plaintiff organizations have standing to challenge these provisions because there is a credible threat that their members will be prosecuted for violating them. So, we address whether those provisions are preempted by VRA Section 208.

No. 24-50826

They are not. Nothing in Section 208 shows that Congress wanted to preempt state election laws like these. To be sure, the federal law is an important one—guaranteeing blind, disabled, and illiterate voters assistance from "a person of [their] choice," with certain exceptions. Contrary to the district court's ruling, though, this federal right does not vaporize all additional state voter assistance regulations. That would mean, for instance, that states could not bar voter assistance by minors, by prisoners, by persons carrying firearms, by electioneers, or by the candidates themselves. By enacting Section 208, Congress did not intend that bizarre result.

Accordingly, we reverse the district court's judgment, vacate the permanent injunction, and remand for further proceedings consistent with this opinion.

## I. Background

### A. Facts

The Governor of Texas signed S.B. 1 into law on September 7, 2021. The provisions relevant to this case are §§ 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04. We summarize their content below.

***Disclosure Provisions***. Sections 6.03, 6.05, and 6.07 require someone assisting a voter to disclose certain information. Under § 6.03, the assistor must list on a prescribed form at the polling place his name, address, relationship to the voter, and whether he has received any compensation. Sections 6.05 and 6.07 concern mail-in ballots. Under § 6.05, the assistor must note "on the official carrier envelope" "the relationship of the [assistor]" and "whether the person received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee in exchange for providing assistance." Noncompliance is a felony. Tex. Elec. Code § 86.010(f), (g). Finally, § 6.07 requires the vote-by-

4

No. 24-50826

mail official carrier envelope to include space for noting the assistor's relationship to the voter.

***Oath Provision.*** Section 6.04 amends the pre-existing assistor oath by adding the underlined text:

> I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote. . . . I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; ~~and~~ I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.

***Compensation Provisions.*** Section 6.06 penalizes someone who "compensates or offers to compensate another person for assisting voters," or who "solicits, receives, or accepts compensation for" doing so. *See* TEX. ELEC. CODE § 86.0105. Section 7.04 penalizes someone who "[1] directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit," or [2] "directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services." *See id.* § 276.015(b), (c).[1]

---

[1] "'Vote harvesting services' means in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEX. ELEC. CODE § 276.015(a)(2). And "'[b]enefit' means anything reasonably regarded as a gain or advantage, including a

No. 24-50826

## B. Proceedings

The plaintiffs are organizations[2] with members who require voting assistance as well as staff and volunteers who assist voters. They sued in federal district court claiming the challenged provisions are preempted by VRA Section 208. That section provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508.

Named as defendants were the State of Texas; Texas Secretary of State and the Texas Attorney General (together, the "State officials"); the District Attorneys of Bexar County, Harris County, Travis County, Dallas County, Hidalgo County, and El Paso County (together, the "DAs"); and local election officials in Bexar County, Dallas County, El Paso County, Harris County, Hidalgo County, and Travis County (together, the "election officials").[3]

---

promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." *Id.* § 276.015(a)(1).

[2] They are: The Arc of Texas; Delta Sigma Theta Sorority; Mi Familia Vota; OCA-Greater Houston; The League of Women Voters of Texas (the "League"); REVUP-Texas; La Union Del Pueblo Entero (LUPE), Mexican American Bar Association of Texas (MABA), Friendship-West Baptist Church, the Southwest Voter Registration Education Project, Texas Impact, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin (together, the "LUPE Plaintiffs"); and League of United Latin American Citizens Texas (LULAC), Voto Latino, Texas Alliance for Retired Americans, and Texas AFT (together, the "LULAC Plaintiffs").

[3] Various Republican Committees were allowed to intervene as defendants, after a panel of our court reversed the district court's order initially denying their intervention. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 309 (5th Cir. 2022). Those

No. 24-50826

The district court found that at least one plaintiff organization had standing to challenge each provision.

On the merits, the court held that Section 208 preempted each of the challenged provisions. The court interpreted Section 208 and our decision in *OCA-Greater Hous. v. Texas*, 867 F.3d 604 (5th Cir. 2017) [*OCA*], to "unambiguous[ly]" mean that a State may not "impose additional limitations or exceptions not stated in" Section 208.

Applying that principle, the court reasoned that Section 208 preempts (1) the Disclosure Provisions because they require assistors to disclose "duplicative information," distinguish between "normal" and abnormal assistance, and narrow the universe of willing assistors; (2) the Oath Provision because the added "penalty of perjury" language is "intimidating" and "scary" and has a chilling effect on assistors; and (3) the Compensation Provisions because they "facially restrict the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of the statute."

Accordingly, the court permanently enjoined the State officials and the DAs from enforcing §§ 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04. The State officials, the Intervenors, and the Harris County DA timely appealed.

## II. Standard of Review

We "review[] a permanent injunction for abuse of discretion." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 432 (5th Cir. 2023). A court abuses its discretion by relying on an erroneous legal conclusion. *Id.* at

_____

intervenors are the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee (together, "Intervenors").

No. 24-50826

433. Standing and preemption are legal issues reviewed *de novo. See OCA*, 867 F.3d at 610.

*    *    *

On appeal, the State officials, the Intervenors, and the Harris County DA contend the district court erred both in concluding that any plaintiff organization had standing to challenge the pertinent provisions, and also in holding that Section 208 preempted each provision.[4]

We begin with standing (*infra* Part III) and conclude the district court erred as to the Disclosure and Oath Provisions. No plaintiff organization has standing to challenge those. The court was correct, though, that two organizations have standing to challenge the Compensation Provisions. Accordingly, we then consider whether those provisions are preempted by VRA Section 208 and conclude they are not (*infra* Part IV).

## III. STANDING

To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

An organization "may have standing either by showing it can sue on behalf of its members ('associational' standing) or sue in its own right

---

[4] Our precedent forecloses the State officials' argument that sovereign immunity bars plaintiffs' claims. *See OCA*, 867 F.3d at 614 ("The VRA . . . validly abrogated state sovereign immunity.").

('organizational' standing)." *Texas State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022). "'Associational standing' is derivative of the standing of the association's members, requiring that [1] they have standing and [2] that the interests the association seeks to protect be germane to its purpose." *OCA*, 867 F.3d at 610. Organizations suing on their own behalf "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024).

We consider whether standing exists as to each challenged provision because "plaintiffs must establish standing for each and every provision they challenge." *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019). "[O]nce we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

## A. Disclosure Provisions

The district court ruled some of the plaintiff organizations had standing to challenge the Disclosure Provisions (specifically, Delta Sigma Theta, LUPE, MABA, and FIEL). We consider whether that is so.

### 1.

Beginning with organizational standing, the district court concluded that certain plaintiff organizations (specifically, Delta Sigma Theta, LUPE, MABA, and FIEL) could challenge the Disclosure Provisions because they made it harder to recruit members due to fear of prosecution. We disagree.

The organizations identify no credible threat that any assistors will be prosecuted for violating the Disclosure Provisions. *See Elfant*, 52 F.4th at 257 (5th Cir. 2022) ("Plaintiffs . . . lack standing . . . because there is no credible threat they will be prosecuted."). They offer no evidence that any assistor has violated them or is likely to do so. Nor do they cite any investigations or

No. 24-50826

prosecutions of assistors since the provisions were enacted. All they offer is the "fanciful notion" that an assistor might run afoul of the provisions and be prosecuted. *Ibid.* But that speculation, which "depends on a 'highly attenuated chain of possibilities,'" *ibid.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), fails to establish actual or imminent injury. *Cf. Inst. for Free Speech v. Johnson*, --- F.4th ---, 2025 WL 2104354, at *5 (5th Cir. July 28, 2025) (explaining a plaintiff must show his "proposed conduct will run afoul of Texas law" to show pre-enforcement injury). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

For similar reasons, the alleged recruitment difficulties are not "fairly traceable to the challenged action of the defendant[s]." *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (cleaned up). They are traceable, rather, to baseless speculation about future prosecutions.[5]

The organizations respond that these provisions "chill" their activities. That argument also fails. "Chilling" is sometimes sufficient for standing in the First Amendment context, but plaintiffs assert no First Amendment claim. *See Pool v. City of Houston*, 978 F.3d 307, 311 (5th Cir. 2020) ("This special standing rule for First Amendment cases recognizes that people should not have to expose themselves to actual arrest or

---

[5] To the extent the argument depends on the fears of non-member assistors, it likewise fails. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing . . . is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up). To "thread the causation needle," a plaintiff "must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal quotation marks omitted). The organizations failed to show that the "predictable" reaction to the Disclosure Provisions is volunteers' refusal to assist eligible voters.

No. 24-50826

prosecution in order to challenge a law that infringes on speech" (cleaned up)). Even had they done so, though, "[t]he chilling effect must have an objective basis[.]" *Elfant*, 52 F.4th at 256 (citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Here, any chill is purely subjective and therefore inadequate to show injury. *See ibid.* ("[A]llegations of a subjective chill are not an adequate substitute." (cleaned up)).

The organizations next argue they have standing because they must "expend resources" to educate their members about the provisions. They are again mistaken. "[D]ivert[ing] . . . resources in response to a defendants' actions" does not establish standing. *All. for Hippocratic Med.*, 602 U.S. at 395.

Finally, the organizations argue they have standing because the provisions "directly regulate" them. We again disagree. Even if it could be said that the Disclosure Provisions "directly" regulate the organizations, that does not *ipso facto* establish injury. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) ("Because it is the object of the Guidance *and* has suffered multiple injuries as a result, Texas has constitutional standing" (emphasis added)). The organizations must still show an actual or imminent injury caused by that regulation and, as discussed, they fail to do so. *All. for Hippocratic Med.*, 602 U.S. at 382.

Accordingly, we conclude that no plaintiff organization has shown organizational standing to challenge the Disclosure Provisions.

**2.**

The organizations also argue on appeal that they have associational standing to challenge the Disclosure Provisions, an issue the district court did not address. They argue the provisions caused their members to vote without their preferred assistors because they feared exposing them to possible

No. 24-50826

criminal liability. We disagree that this establishes associational standing, however.

The members' alleged fears are not "fairly traceable to the challenged action of the defendant[s]," *Reule*, 114 F.4th at 367 (cleaned up), but instead to baseless speculation about future prosecutions. As with organizational standing, *see supra* III.A.1, such augury does not establish Article III standing. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

The organizations insist, however, that their members' injury is the loss of their voting rights, not the fear of prosecution. That does not help their case. Any such injury would be traceable, not to the challenged provisions, but to members' unfounded speculation that an assistor might be prosecuted under them. *Reule*, 114 F.4th at 367; *Elfant*, 52 F.4th at 257.

Finally, the organizations argue that the provisions harm their members by causing delays in voting. We again disagree. Waiting a few minutes while an assistor completes a simple form is not a cognizable injury because it merely involves the "usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008).[6] Such inconvenience does not bear a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (cleaned up).

---

[6] The record says nothing about how long it takes to fill out the forms required by the Disclosure Provisions. But bear in mind that they require an assistor only to list his name, address, relationship to the voter, and whether he received compensation. The organizations vaguely assert only that voting lines are now "longer." That falls far short of establishing a cognizable Article III injury.

No. 24-50826

Accordingly, we conclude that no plaintiff organization has shown associational standing to challenge the Disclosure Provisions.

In sum, no plaintiff organization has either associational or organizational standing to challenge the Disclosure Provisions. The district court erred by ruling otherwise.

### B. Oath Provision

The district court ruled some of the plaintiff organizations had standing to challenge the Oath Provision. Specifically, the court ruled that the Arc had associational standing and Delta Sigma Theta, LUPE, MABA, and FIEL had organizational standing to challenge the provision.

Recall that this provision added language to the existing oath to clarify, *inter alia*, that it is taken "under penalty of perjury" and that the voter represented to the assistor he was "eligible to receive assistance." According to the court, the revised oath harmed the Arc's members because their assistors were "uncomfortable" taking it out of "fear of . . . potential criminal liability." And according to the court, the revised oath harmed Delta Sigma Theta, LUPE, MABA, and FIEL because they "have had difficulty recruiting members . . . due to the threat of criminal sanctions under . . . [the] Oath requirements." For largely the same reasons as the Disclosure Provisions, however, this evidence fails to show Article III standing.

The record shows that any assistors' fears of being prosecuted under the Oath Provision were based on pure speculation. No evidence showed that assistors were planning to violate the revised oath (or were likely to do so) nor that anyone had been (or would likely be) prosecuted for violating it. Any argument that an assistor might be prosecuted under the provision depends on a "fanciful" and "highly attenuated chain of possibilities" inadequate to support standing. *Elfant*, 52 F.4th at 257 (quoting *Clapper v. Amnesty Int'l*

13

No. 24-50826

*USA*, 568 U.S. 398, 410 (2013)). Federal courts cannot adjudicate hypotheticals. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).[7]

The argument for harm here is puzzling given that the Oath Provision merely confirmed what the law already was. The existing oath was *already* taken under penalty of perjury and it was *already* an offense to knowingly assist voters ineligible for assistance.[8] We cannot fathom how the Oath Provision harmed plaintiffs' members by making the existing consequences of violating the law more explicit. In any event, being afraid of falsely swearing an oath does not bear a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (cleaned up).

Accordingly, we conclude that no plaintiff organization has standing to challenge the Oath Provision. The district court erred by ruling otherwise.[9]

## C. Compensation Provisions

The district court ruled some of the plaintiff organizations had standing to challenge the Compensation Provisions, §§ 6.06 and 7.04 (specifically, OCA, LUPE, the League, and MABA as to § 6.06 and the

---

[7] To the extent the argument depends on the fears of any non-member assistors, it fails for the same reason as does the argument for organizational standing respecting the Disclosure Provisions. *See All. for Hippocratic Med.*, 602 U.S. at 383.

[8] *See* TEX. ELEC. CODE § 64.034 (2020) (requiring assistors to swear an oath that they "will not suggest, by word, sign, or gesture, how the voter should vote"); TEX. ELEC. CODE § 64.036 (2020) (making it an offense to "knowingly . . . provide[] assistance to a voter who has not requested assistance"); TEX. PENAL CODE § 37.02 (2020) (defining perjury as making a false statement under oath "with intent to deceive and with knowledge of the statement's meaning").

[9] To the extent that the organizations rely on a diversion-of-resources theory to challenge the Oath Provision, we reject that argument for the same reason as we did with respect to the Disclosure Provisions.

No. 24-50826

LULAC and LUPE Plaintiffs as to § 7.04). We agree with respect to some of those organizations.

### 1.

Start with § 6.06. Recall that this provision criminalizes persons who compensate or receive compensation for assisting a disabled by-mail voter. TEX. ELEC. CODE § 86.0105. The district court found that OCA, LUPE, the League, and MABA "have provided their staff members and volunteers with 'compensation' ... for assisting voters, including mail voters." Accordingly, the court concluded that § 6.06 exposes those members to criminal liability, causing them injury. The court also found that plaintiffs' injuries are traceable to the State officials and the DAs and that enjoining them would redress the injuries.[10]

We agree OCA and LUPE have standing.[11] At trial, OCA established that the provision bars conduct the organization engages in—namely, compensating staffers for assisting voters. And OCA asserts it would "absolutely" continue doing this "but for the statute's proscription of such conduct." State witnesses also testified that § 6.06 applies to services provided by LUPE. Accordingly, OCA and LUPE suffered injury because they have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [§ 6.06], and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v.*

---

[10] The State officials do not contest standing as to § 6.06, but the Harris County DA does. We agree with the district court that plaintiffs' § 6.06 injuries are not traceable to the local election officials.

[11] We disagree as to MABA and the League, however. There is no credible threat they will be prosecuted for violating § 6.06 because they offer their volunteers coffee, tea, or water in exchange for assisting voters. These provisions do not plausibly count as "compensation" under § 6.06.

No. 24-50826

*Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).[12]

The Harris County DA argues these members suffer no injury because there is no credible threat it will prosecute them for violating § 6.06. We disagree. OCA and LUPE established they have engaged in (and will continue to engage in) conduct prohibited by § 6.06. The Harris County DA has not disavowed prosecutions under § 6.06 for that behavior, so a credible threat of prosecution exists.

The DA does not contest traceability and redressability, but in any event they are easily met. "[T]he district attorney . . . is charged with prosecuting individuals who violate criminal laws" in Harris County, *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 785 (5th Cir. 2024), and so the threat of prosecution would be redressed by enjoining the DA. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury.").

### 2.

Moving on to § 7.04, recall that it penalizes giving, offering, or receiving "compensation or other benefit" for vote harvesting, defined as in-person interaction in the presence of a ballot meant to deliver votes for a candidate or measure. The district court found that the LUPE and LULAC Plaintiffs' activities expose them to liability under § 7.04, causing them injury traceable to the defendants that would be redressed by an injunction.

---

[12] The Harris County DA argues *SBA List* is inapt because OCA and LUPE's claims are not "affected with a constitutional interest." We disagree. Their conduct arguably implicates the right to vote. Regardless, though, plaintiffs need not "violate a criminal provision and risk prosecution to challenge it." *In re Gee*, 941 F.3d at 161 n.3.

No. 24-50826

We agree. At trial, the LUPE and LULAC Plaintiffs established that the provision bars conduct they have engaged in and will continue to engage in—namely, advocating for candidates and ballot measures through compensated, in-person interactions with voters in the presence of ballots. And the district court found that § 7.04 caused them to stop doing that.

The State officials and the Harris County DA argue these fears about prosecution are speculative. Not so. Not only did the LUPE and LULAC Plaintiffs show their ongoing and future activities fall within § 7.04, but a state witness testified that he would be concerned those activities constitute voter fraud. That distinguishes these plaintiffs' concrete fears of prosecution under § 7.04 from the speculative fears of prosecution under the Oath and Disclosure Provisions. *See SBA List*, 573 U.S. at 159.[13]

Accordingly, we conclude the LUPE and LULAC Plaintiffs have standing to challenge § 7.04.

## IV. PREEMPTION

We now consider whether VRA Section 208 preempts S.B. 1's Compensation Provisions. The district court held those provisions were preempted because they impose "additional limitations or exceptions" on assistors beyond those permitted by Section 208. On appeal, Appellants (the State officials and Intervenors) contend this was error.[14] After setting out the analytical guardrails, we address their arguments.

---

[13] Just as with § 6.06, traceability and redressability are easily met and no defendant argues otherwise.

[14] The State officials and the Intervenors make similar arguments with respect to preemption, so we treat them together unless context requires otherwise. We refer to those parties in this part collectively as "Appellants."

17

No. 24-50826

## A.

Preemption flows from the Supremacy Clause. *See* U.S. CONST. art. VI, cl. 2; *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020). "State law is preempted when (1) a federal statute expressly preempts state law ("express preemption"); (2) federal legislation pervasively occupies a regulatory field ("field preemption"); or (3) a federal statute conflicts with state law ("conflict preemption")." *Deanda v. Becerra*, 96 F.4th 750, 760–61 (5th Cir. 2024) (citing *Arizona v. United States*, 567 U.S. 387, 398–400 (2012)).

This case involves only conflict preemption and, specifically, the variant known as "purposes and objectives" preemption. *See Kansas*, 589 U.S. at 213–14 (Thomas, J., concurring). Under this theory, a state law is preempted if it "stands as an obstacle" to fulfilling a federal law's "full purposes and objectives." *See Deanda*, 96 F.4th at 761 (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000)). This kind of preemption claim must clear a "high threshold." *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)). "Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Ibid.* (quoting *Whiting*, 563 U.S. at 607).

Moreover, a presumption *against* preemption applies in this case. That is for two related reasons. First, S.B. 1 represents the exercise of Texas's historic police powers in administering elections. *See Deanda*, 96 F.4th at 761 (presumption against preemption applies to "the historic police powers of the States") (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)); *see also, e.g., Storer v. Brown*, 415 U.S. 724, 730 (1974) (discussing state authority over its electoral processes); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) (same);

No. 24-50826

*Vote.Org v. Callanen*, 89 F.4th 459, 481 (5th Cir. 2023) (same). Second, preemption here would alter the federal-state balance of power. *See GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 271 (4th Cir. 2025) ("When reading statutes, we assume Congress normally preserves the constitutional balance between the National Government and the States.") (quoting *Bond v. United States*, 572 U.S. 844, 862 (2014)) (internal quotation marks removed).

Accordingly, we will find preemption of the Compensation Provisions only if Section 208 expresses Congress's "clear and manifest purpose" to do so. *Deanda*, 96 F.4th at 761 (quoting *Altria Grp.*, 555 U.S. at 77); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (federal law preempts historic state powers only if "that was the clear and manifest purpose of Congress"); *Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 364 (5th Cir. 2025) (same).[15]

With that background in mind, we turn to whether VRA Section 208 preempts S.B. 1's Compensation Provisions.

## B.

We start with Section 208's text. A blind, disabled, or illiterate voter "may be given assistance by *a person of the voter's choice*, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added). The district court read this text to preempt the Compensation Provisions, which bar assistance from persons

---

[15] The presumption against preemption does not apply where Congress legislates pursuant to its authority under the Elections Clause to regulate elections of federal Representatives and Senators. *Repub. Nat'l Comm. v. Wetzel*, 120 F.4th 200, 206 (5th Cir. 2024) (citing *Arizona v. Inter-Tribal Council of Ariz.*, 570 U.S. 1, 14 (2013)); *see* U.S. Const. art. I, § 4, cl. 1. No one argues that VRA Section 208 was enacted under the Elections Clause, however—presumably because the provision applies to state and federal elections.

No. 24-50826

who are compensated (§ 6.06) or who are paid ballot harvesters (§ 7.04). These laws are preempted, the court held, because they "facially restrict the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of [Section 208]."

Appellants contend this is a "breathtaking[ly]" broad reading of Section 208 that would vaporize numerous state laws. We agree. Consider any number of examples.

States bar voter assistance by minors, by candidates, by candidates' relatives, by election judges, and by poll watchers.[16] Each of these laws "facially restricts" who can assist voters. Is each preempted by Section 208? Unlikely. Or consider Texas's ban on firearms at polling places. TEX. PENAL CODE § 46.03(a). Despite this, does Section 208 entitle a disabled voter to help from someone carrying a Glock? That would be surprising. Or consider Texas's ban on "electioneering" (*i.e.*, advocacy) near polls. TEX. ELEC. CODE § 61.003(a), (b)(1). Does Section 208 entitle a blind voter to help from someone holding a candidate's sign? Doubtful. Or, to pile absurdity on absurdity, what if an illiterate voter's "choice" of assistor is in prison? Does Section 208 require a furlough?

Sensing this problem, the district court tried to temper its absolutist reading of Section 208. In a footnote, the court proclaimed it "self-evident" that assistors must be "actually *capable*" of helping voters (this would take care of prisoners) and that assistors "remain subject to generally applicable laws" (this would take care of Glock-toting assistors). But those concessions

---

[16] *See, e.g.*, HAW. REV. STAT. ANN. § 11-139 (prohibiting candidate from assisting); M.C.L.S. § 168.751 (prohibiting minors from assisting); 25 P.S. § 3058(b) (prohibiting judge of election from assisting); O.C.G.A. § 21-2-409(b) (prohibiting candidate or candidate's relatives from assisting); MISS. CODE ANN. § 23-15-549 (prohibiting the candidate and poll watchers from assisting voters).

No. 24-50826

give away the store. By the district court's own reasoning, "a person of the voter's choice" cannot be read literally to negate any state law that restricts the universe of assistors. So, if a state may bar assistance from a candidate, a poll watcher, a minor, an electioneer, or someone carrying a gun, why can't it also bar assistance from a paid ballot harvester?[17]

At bottom, nothing compels us to read "a person of the voter's choice" in a maximalist way that erases swaths of state election laws. Context and common sense counsel a more restrained reading—one guaranteeing eligible voters help from "a person"[18] of their choice, while allowing states to superintend voter assistance. Recall, moreover, that we are reading the phrase, not in the abstract, but in the context of a preemption claim that faces steep odds. As a "purposes and objectives" claim, it must surmount a "high threshold." *Barrosse*, 70 F.4th at 320. As a claim involving core state authority, it must demonstrate Congress's "clear and manifest" intent to preempt. *See Deanda*, 96 F.4th at 761. Section 208 comes nowhere close to meeting those standards.

So, the district court erred by relying on the text of Section 208 to find preemption of the Compensation Provisions.

---

[17] To answer such questions, the district court posited a distinction between "generally applicable laws" (which are evidently not preempted by Section 208) and laws that "regulate voter assistance specifically" (which are). We see no difference, though. If Section 208 does not preempt a state law providing that "No firearms are allowed in a polling place," then it also does not preempt a state law providing that "Persons carrying a firearm cannot assist voters in a polling place." The latter restricts assistors in precisely the same way as the former.

[18] The parties dispute whether the article "a" here means "any" or "one" or "some." That abstruse grammatical debate misses the point. We are not reading a single article but an entire phrase—"a person of the voter's choice." Neither that text nor its context requires a maximalist reading that would bulldoze numerous state election laws.

No. 24-50826

## C.

To support its reading of Section 208, the district court also relied on our decision in *OCA*, 867 F.3d 604. As Appellants point out, however, *OCA* did not decide the question before us.

In *OCA*, Mallika Das, a Texas voter with limited English, wanted her son to interpret her ballot at the polling place. But Texas law required an "interpreter" to be registered in the voter's county, *see* TEX. ELEC. CODE § 61.033, and Das's son was not. Das was unable to complete her ballot alone, and she then sued under § 1983, claiming the Texas law violated her right to assistance in VRA Section 208. *See OCA*, 867 F.3d at 607–09.

The parties' dispute concerned "how broadly to read the term 'to vote' in Section 208 of the VRA." *Id.* at 614. Texas guaranteed voters "assistance" only with marking the ballot but not outside the ballot box. *Id.* at 608, 614; *see* TEX. ELEC. CODE § 64.0321. As we explained, though, the VRA guarantees "assistance to vote" both *before* and *after* entering the ballot box. *OCA*, 867 F.3d at 615; *see* 52 U.S.C. § 10310(c)(1) (defining "vote"). We held that Texas violated Section 208 by defining the scope of assistance more narrowly than the federal statute, thus depriving Das of her Section 208 right. *See OCA*, 867 F.3d at 615 (holding Texas "cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined").

As this description shows, *OCA* did not address the meaning of the term "a person of the voter's choice" in Section 208. The decision turned entirely on the definition of the term "vote" in the VRA, which Texas law had narrowed. *See id.* at 614 ("The unambiguous language of the VRA['s definition of 'vote'] resolves the parties' disagreement."). So, *OCA* does not

No. 24-50826

speak to the issues before us in this case, and the district court erred in concluding otherwise.[19]

## D.

The district court also relied on the *expressio unius*, or negative-implication, canon. Because Section 208 "explicitly enumerates" two groups barred from assisting voters (a voter's employer or union), the court reasoned that "additional exceptions are not to be implied." Appellants argue the court misapplied the canon. We agree.

"*Expressio unius* teaches that '[t]he expression of one thing implies the exclusion of others.'" *United States v. Vargas*, 74 F.4th 673, 686 (5th Cir. 2023) (en banc) (quoting SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012)). The canon does not apply to every statutory list, though. "The context must justify . . . the inference that items not mentioned were excluded by deliberate choice." *Ibid.* (quoting *Barnhardt v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). So, here one would ask whether, by barring two groups from being assistors, Congress intended that *no* other group could be barred. *See ibid.* (to apply the canon, one first asks "[w]hether the statutory text communicates exclusivity") (quoting *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013)).

---

[19] The district court quoted *OCA*'s statement that the "combined effect" of Section 208 and Texas law was to afford voters "the right to select any assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself . . . ." *OCA*, 867 F.3d at 608. But this overreads the decision. *OCA* was merely summarizing the background law in an introductory section; it was not interpreting the language of Section 208. And elsewhere the opinion quoted Section 208's actual text. *See id.* at 607. Moreover, as discussed *supra*, the preemption question here does not turn on the nuances of the article "a" in Section 208, but instead on whether the phrase, in context, clearly announced Congress's intent to preempt swaths of state election law. We conclude that maximalist reading of the phrase is not demanded either by its text or its context.

No. 24-50826

As we have already explained, this would be a bizarre way to read Section 208. Yes, Congress specified that a voter cannot be assisted by his employer or union. From that, though, why should we infer that Congress wanted no *other* group excluded? That would mean a state could not prohibit voter assistance by candidates, candidates' relatives, electioneers, minors, or prisoners. Absurd. The far more sensible inference from Section 208 is that Congress specified two groups who, it feared, might influence vulnerable voters—without implying any judgment about other circumstances that might bear on voter assistance.

Beyond that, there is another problem with the district court's rationale. "[T]he premise for applying *expressio unius*," we have explained, is the presence of "an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice." *Vargas*, 74 F.4th at 687 (quoting *Barnhart*, 537 U.S. at 168) (cleaned up). That is, the canon does not apply where the omitted item is "conceptually different from the listed [items]." *Id.* at 686 (citation omitted). That is the case here.

The Section 208 exclusions and those in S.B. 1's Compensation Provisions are "conceptually different." While Section 208 categorically bars two classes based on their relationship to the voter (employers and unions), the Compensation Provisions bar people based on whether they are compensated or paid ballot harvesters. The two sets of prohibitions are not "an associated group or series," *id.* at 687, such that including one implies excluding the other. This is common sense. The fact that Congress did not want voters to be assisted by their employers or unions says nothing about whether Congress wanted voters to be assisted by ballot harvesters. "That removes the premise for applying *expressio unius*." *Ibid.*

For either reason, the district court erred by relying on the *expressio unius* canon to find preemption.

No. 24-50826

## E.

Finally, the district court's ruling also relied on quotes from the Senate Judiciary Committee Report on Section 208. *See* S. Rep. No. 97-417 (1982). Appellants argue this material does not support preemption. We again agree.

To begin with, a committee report is not the law. *See Matter of DeBerry*, 945 F.3d 943, 949 (5th Cir. 2019) ("We are reluctant to rely on legislative history for the simple reason that it's not law."). The report was not passed by Congress and signed by the President. U.S. Const. art. I, § 7, cl. 2; *see I.N.S. v. Chadha*, 462 U.S. 919, 945–46 (1983) (discussing bicameralism and presentment). Yes, the Supreme Court drew on this particular Senate Report to interpret another section of the VRA, *see Thornburg v. Gingles*, 478 U.S. 30, 43–46 (1986), but the Court has never deemed it authoritative as to Section 208.

In any event, legislative history cannot overcome the presumption against preemption. *Deanda*, 96 F.4th at 765. After all, a proponent of preemption must show Congress's "clear and manifest" intent to preempt an exercise of core state authority. In such circumstances, resort to legislative history is effectively an admission of defeat. "[It] is a flashing red sign that no 'clear and manifest' intent to preempt is shown" in the actual law. *Ibid.* (citations omitted).

But even if the Senate Report were relevant, it would cut against preemption, not in favor of it. Some of the snippets cited by the district court merely restate what the statute says, and so are of no help. *See* S. Rep. No. 97-417, at 2 (under "new subsection 208 . . . voters who are blind, disabled, or illiterate are entitled to have assistance in a polling booth from a person of their own choosing, with two exceptions"). Others, however, expressly recognize that a state's "legitimate right . . . to establish necessary election

No. 24-50826

procedures" must be preserved, provided they are "designed to protect the rights of voters." *Id.* at 61. Furthermore, the report envisions that Section 208 would have, at most, a modest preemptive effect. *See ibid.* (predicting preemption "only to the extent" state laws "unduly burden the right recognized in [Section 208]"). So, even if probative (which it is not), the Report does not remotely support the district court's maximalist view of Section 208's preemptive effect.[20]

Recall, moreover, that this is a "purposes and objectives" claim. As to such claims, courts have been told to avoid "freewheeling judicial inquir[ies] into whether a state statute is in tension with federal objectives." *See Kansas*, 589 U.S. at 202; *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011); *see also Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead op. of GORSUCH, J.) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law[.]"). That should counsel against finding preemption by stitching together scraps of legislative history. If Congress's "purposes and objectives" are to displace state law, those purposes and objectives must be gleaned from the text of a federal law enacted through the procedures demanded by the Constitution. *See Virginia Uranium*, 587 U.S. at 767 (lead op. of GORSUCH, J.) ("[T]he supremacy of the laws is attached to those only, which are made in pursuance of the constitution[.]") (quoting

---

[20] The district court seemed to believe that the Senate Report could somehow set the standard for measuring Section 208's preemptive effect—namely, that Section 208 would preempt any state voter assistance regulations that do not "encourage greater participation in the voting process." Not so. The preemptive effect of federal law flows from the Supremacy Clause and Supreme Court decisions applying it, not from musings in a committee report. So, a report cannot dilute the legal standard that Section 208 preempts state law only if its text shows Congress's "clear and manifest" intent to do so.

No. 24-50826

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1831 p. 694 (1st ed. 1833)).

The district court erred by drawing on the Senate Report to support preemption of the Compensation Provisions.

\*       \*       \*

In sum, we conclude that the district court erred in ruling that VRA Section 208 preempts the Compensation Provisions in S.B. 1.

## IV. CONCLUSION

We REVERSE the district court's judgment, VACATE the permanent injunction of §§ 6.03, 6.04, 6.05, 6.06, 6.07, and 7.04, and REMAND for further proceedings consistent with this opinion.

JAMES E. GRAVES, JR., *CIRCUIT JUDGE*, DISSENTING:

Because S.B. 1's Compensation Provisions are a violation of the Voting Rights Act and because the plaintiffs have standing to challenge S.B. 1's Oath Provision and Disclosure Provisions, I respectfully dissent.

## I.

### A.    S.B. 1 & the Challenged Provisions

In September 2021, Texas enacted the Election Protection and Integrity Act, an omnibus election law colloquially referred to as "S.B. 1." The Act amended procedures pertaining to early voting, voting by mail, voter assistance, and other election practices. The instant appeal concerns three categories of amendments to the Texas Election Code, described below.

### 1.    Oath Provision (§ 6.04)

Texas election law has generally required that any person who assists a voter in completing a ballot swear an oath of assistance. S.B. 1 revised the text of the oath, and proscribed that a violation of the oath constituted a state jail felony punishable by (1) up to two years in prison, (2) up to a $10,000 fine, and/or (3) rejection of the voter's ballot.

S.B. 1's revisions are reflected below:

> I swear (or affirm) <u>under penalty of perjury</u> that <u>the voter I am assisting represented to me they are eligible to receive assistance</u>; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to <u>reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot</u> ~~answering the voter's questions, to stating propositions on the ballot, and to naming candidates, and if listed, their political parties~~; I will prepare the voter's ballot as the voter directs; <u>I did not pressure or coerce the voter into choosing me to provide assistance;</u> ~~and~~ I am not the voter's employer, an

agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; <u>I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.</u>

TEX. ELEC. CODE § 64.034.

### 2.    Disclosure Provisions (§§ 6.03, 6.05, 6.07)

Texas election laws have also required that individuals assisting voters also provide identifying information. Prior to S.B. 1, assistors were required to provide their name and residential address (and for mail-in voting assistors, a verifying signature). S.B. 1 added two additional disclosures: (1) the assistor's relationship to the voter, and (2) any compensation received by the assistor from a candidate, campaign, or political action committee. *See* TEX. ELEC. CODE §§ 64.0322(a) (in-person assistance); 86.010(e) (mail-in ballot assistance); 86.013(b) (ballot dropping assistance).

### 3.    Compensation Provisions (§§ 6.06, 7.04)

Section 6.06 of S.B. 1 established a felony for those who compensate, offer to compensate, solicit, or accept compensation for assisting voters with their mail-in ballots. TEX. ELEC. CODE § 86.0105(a), (c). The provision does not apply to an assistor who is either an "attendant" or "caregiver" that is "previously known to the voter." *Id.* § 86.0105(f). All three of these terms are undefined by the exception.[21]

Section 7.04 created three felonies criminalizing Texas' notion of "vote harvesting." The statute defines the term as any "in-person

---

[21] During the bench trial, a Texas election official conceded that "previously known" could refer to an assistor who met the voter roughly fifteen minutes before the voting actually occurred.

interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEX. ELEC. CODE § 276.015(a)(2). S.B. 1 criminalizes (1) offering or providing vote harvesting services in exchange for compensation or benefit, (2) offering or providing compensation in exchange for vote harvesting services, or (3) collecting or possessing a mail-in ballot in connection with vote-harvesting services. *Id.* § 276.015(b), (c), (d).

## B.    The Plaintiffs[22]

In the weeks preceding and following S.B. 1's enactment, dozens of plaintiffs sued to enjoin its implementation. The instant appeal features four groups of those plaintiffs whose claims proceeded to a bench trial.

### 1.    HAUL-MFV

The first group, "HAUL-MFV," is comprised of two nonprofit organizations: Delta Sigma Theta Sorority, Inc. ("DST") and the Arc of Texas ("the Arc"). They challenge the Oath and Disclosure Provisions.

DST is a national nonpartisan organization of Black, college-educated women that focuses on empowering the Black community through social action. Relevant to S.B. 1, Texas-based DST chapters visit nursing homes and senior facilities to assist with mail-in ballots, and provide volunteers to assist with in-person voting.

The Arc is a nonprofit that focuses on advocacy for Texans afflicted with intellectual and developmental disabilities. The organization views

---

[22] There are three categories of defendants: the Texas Attorney General, who is the State's chief law enforcement officer and tasked with enforcing the Texas Election Code's criminal provisions; the Texas Secretary of State, who is the State's chief elections officer and tasked with facilitating state-level elections; and various District Attorneys, who are tasked with enforcing the criminal provisions of S.B. 1.

voting as "the backbone" of its work because it is critical to the self-determination of its members.

### 2.   OCA Plaintiffs

The "OCA Plaintiffs" encompasses two organizations that challenge the mail-in ballot Compensation Provision: OCA – Greater Houston ("OCA-GH"), and the League of Women Voters of Texas (the "League"). OCA-GH advances the wellbeing of Asian American and Pacific Islander persons in the greater Houston area. Relevant to S.B. 1, OCA-GH organizes election-related activities that require volunteer and staff assistance. These activities include town halls and meet-and-greet events, door-knocking (canvassing) efforts, and mail-ballot assistance.

The League is a nonpartisan organization that focuses on empowering voters and defending democracy. Some of its members volunteer by providing voting assistance, while others receive assistance while completing their ballots. The League provides complimentary tea, coffee, and water to its volunteers.

### 3.   LUPE Plaintiffs

The "LUPE Plaintiffs" consist of three organizations: La Union Del Pueblo Entero ("LUPE"), the Mexican American Bar Association ("MABA"), and Familias Inmigrantes y Estudiantes en la Lucha[23] ("FIEL"). They challenge the Oath and Disclosure Provisions, as well as the in-person Compensation Provision. LUPE is a Texas-based nonprofit organization that focuses on assisting low-income "colonia" residents—those who live in substandard conditions along the U.S.-Mexico border. Relevant to S.B. 1, LUPE organizes staff members, temporary paid

---

[23] Spanish for "Immigrant Families and Students in the Fight."

canvassers, and volunteers, to engage in-person with voters. The organization also hosts town hall events, and has members who either assist others with, or require assistance for, mail-in or in-person voting. MABA is a volunteer-based membership organization of Latino lawyers across Texas. The organization's attorneys provide pro bono services by performing voter outreach (i.e., tabling events) and assistance to in-person and mail-in voters. FIEL is a civil rights organization that focuses on civic engagement and voter outreach in immigrant communities. Its eight staff members and volunteers assist disabled members with in-person voting.

### 4.   LULAC

Lastly, the League of United Latin American Citizens ("LULAC") challenges the in-person vote harvesting Compensation Provision (§ 7.04). LULAC is a civil rights organization that focuses on protecting the civil rights and wellbeing of Latino persons. Relevant to S.B. 1, LULAC has members and volunteers that participate in voter registration, voter assistance, and get-out-the-vote efforts.

### III.   Injury for Standing Purposes

The majority concludes, in omnibus fashion, that none of the plaintiffs have a sufficient injury[24] to challenge the Oath Provision and the Disclosure

---

[24] As the majority confirms, there is at least one proper defendant that satisfies the traceability and redressability prongs for the Compensation Provisions. *Ante* at 15 n.10, 18 n.13. As to the Oath and Disclosure Provisions, the Secretary of State is a proper defendant that satisfies both requirements because she would have to "correct the form should the judiciary invalidate" the challenged provision. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020).

Provisions.[25] *Ante* at 8–14. For the reasons detailed below, I disagree with this sweeping pronouncement.

Recall that under the familiar three-pronged requirement, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Here, all of the plaintiffs seek injunctive or declaratory relief, meaning that to "satisfy the redressability requirement," they must demonstrate "a continuing injury or threatened future injury" from the challenged statute. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citation omitted).

And because the plaintiffs are organizations, they "can establish an injury-in-fact through either of two theories": associational standing or organizational standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Associational standing is derivative of the group's members: at least one member must have standing, and the interests that the organization seeks to protect must be germane to its purpose. *Id.* (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Organizational standing, meanwhile, assesses injury through "the same standing test that applies to individuals"—the three-pronged injury-in-fact,

---

[25] I agree with the majority's conclusion, *ante* at 15–18, that at least some of the plaintiff organizations have standing to challenge the Compensation Provisions. But I disagree with its conclusion that MABA and the League have "no credible threat" of prosecution for "offer[ing] their volunteers coffee, tea, or water in exchange for assisting voters." *Id.* at 16 n.11. While the majority decrees, without any analysis, that complimentary refreshments "do not plausibly count as 'compensation' under § 6.06," *id.*, we are to "assume that the plaintiff's interpretation of a challenged statute is correct before examining whether the alleged harms . . . are cognizable." *Texas v. Yellen*, 105 F.4th 755, 764 (5th Cir. 2024).

traceability, and redressability inquiry. *Id.* (citing *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

Because standing is assessed on a claim-by-claim basis, I will analyze each organization's injury in the context of each challenged provision. *Cf. Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342, 349 (5th Cir. 2024) ("[P]laintiffs must demonstrate standing for each claim that they press."). That said, it is "well settled" that if "at least one plaintiff has standing" to pursue a particular claim, "we need not consider whether the remaining plaintiffs have standing to maintain" the claim. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

## A.    Oath Provision (§ 6.04)

Five plaintiffs—the Arc, DST, LUPE, MABA, and FIEL—challenge S.B. 1's revisions to the Oath Provision. Only the Arc challenges § 6.04 on its own; the others challenge the combination of the Oath and the Disclosure Provisions. I thus begin by analyzing the Arc's injuries, before addressing the other four organizations' standing in conjunction with the Disclosure Provisions.

Associational standing has three elements: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Texas Democratic Party*, 459 F.3d at 587.

The latter two elements are satisfied here: the Arc's mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities," and claims for injunctive relief under the VRA are not exclusive to natural persons. The Arc's associational standing thus turns on whether it can "identify at least

one member that has suffered or will suffer harm." *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024) (citation omitted).

At least three Arc members, through their bench trial testimony, have evidenced a sufficient injury: Jodi Lydia Nunez Landry, Amy Litzinger, and Nancy Crowther. Each of these members voted in a 2022 Texas election, but none was able to receive assistance from their preferred assistor:

- Nunez Landry suffers from muscular dystrophy and requires assistance for everyday activities. She prefers to vote in person with her partner, who she "can trust" and holds "a certain amount of privacy" with. Ever since S.B. 1's enactment, Nunez Landry has refused to ask her partner for voting assistance because she did not "want to put him in jeopardy" of potential consequences.

- Litzinger suffers from quadriplegic cerebral palsy, which limits her muscle strength and stability, and dysautonomia, which adversely affects involuntary bodily functions. She requires mobility devices and personal assistants, who assist when her muscle strength wanes. Litzinger prefers to vote in person because her varying muscular strength produces inconsistent signatures, which significantly contributes to ballot rejection. After S.B. 1's enactment, "all of" Litzinger's assistants expressed that they were "uncomfortable taking the oath" and declined to provide ballot assistance.

- Crowther has a progressive neuromuscular disease and requires a personal assistant to perform daily activities. She stopped requesting that her assistants accompany her to vote because she "would be mortified . . . if [the assistants] were to get in trouble just for helping" her.

The majority passes over this testimony and declares that any "fears of being prosecuted under the Oath Provision were based on pure speculation." *Ante* at 13. According to the majority, "[a]ny argument that an assistor might be prosecuted under the provision depends on a 'fanciful' and 'highly attenuated chain of possibilities' inadequate to support

standing." *Id.* (quoting *Texas State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022)). I part ways for four connected reasons.

To start, the majority overlooks the vagaries that S.B. 1 injects into the Oath Provision. For one, the provision requires assistors to certify, in present time, compliance with a prospective event of indefinite duration (that they will not "communicate information about how the voter has voted to another person"). Another portion, which requires an assistor to certify that they "did not coerce or pressure" a voter, necessitates insight into or confirmation of another person's state of mind. Later in this opinion, I further detail the vagueness concerns that attend these provisions. *See post* at 40–42. But bluntly stated, some of S.B. 1's additions sow substantial ambiguity into the Oath itself—causing confusion among assistors as to what they are certifying to, and deterring them from serving those less fortunate.

Second, the majority incorrectly cabins the Arc members' concern as merely a "fear[] of being prosecuted." *Ante* at 13. Each member raised concerns related to a burdensome investigation and related ordeals. Nunez Landry, for example, worried of "jeopardy" to her partner, while Crowther spoke of possible "trouble" that her assistants could encounter.

Third, the hypothetical "chain of possibilities" between assistance and investigation or prosecution—a chain link that the majority fails to proffer—is not attenuated at all. Consider this straightforward reading:

1. an individual assists the voter and swears the revised Oath;
2. someone is suspicious and reports the assistor to the authorities;
3. the Secretary of State's office investigates and contemplates referring the matter to a local prosecutor.

Fourth, the majority errs in concluding that fears of prosecution over the Oath Provision are "based on pure speculation" because no assistors represented that they "were planning to violate the revised oath (or were

likely to do so)." *Ante* at 13. But nothing in the Supreme "Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). Moreover, Texas has not disclaimed prosecution: it "has not argued to this [c]ourt that plaintiffs will not be prosecuted if they do what they say they wish to do." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010). And S.B. 1 has only been in effect since 2022. *See Consumer Data Indus. Ass'n v. Texas through Paxton*, No. 21-51038, 2023 WL 4744918, at *5 (5th Cir. July 25, 2023) (per curiam) (finding a credible threat of enforcement in part because the statute was "enacted *less than five years ago*"). Most importantly, the majority overlooks the district court's finding that the Attorney General has already been pursuing allegations of "assistance fraud (purportedly targeted by [all the] challenged provisions)."

At bottom, the question at the standing phase is whether the Arc's members have demonstrated a non-speculative threat of future injury from S.B. 1. In my view, they have, and the Arc has associational standing to challenge the Oath Provision.

### B.    Disclosure Provisions

Four organizations—DST and the LUPE Plaintiffs (LUPE, MABA, and FIEL)—challenge the combination of the Oath and Disclosure Provisions. The district court found that each group possessed organizational standing because they "have had difficulty recruiting members to provide voting assistance services due to the threat of criminal sanctions under S.B. 1 . . . and some members have stopped providing assistance altogether." The majority, for a multitude of reasons, *ante* at 9–13, concludes that no organization has a cognizable injury. I again part ways with my colleagues.

### 1.    Delta Sigma Theta

Delta Sigma Theta advances three theories of organizational standing: the disclosures (1) "impair DST's ability to provide in-person and mail-ballot assistance" by chilling "would-be volunteers [who] are wary about risking criminal liability," (2) "directly regulate DST's assistance to voters" by requiring volunteers to make specific disclosures and oaths, and (3) force the organization "to dedicate resources to respond to the Assistance Restrictions." The organization's most straightforward path to standing comes through the final theory: resource diversion. During the bench trial, DST's Social Action State Coordinator, Sharon Watkins Jones, testified that as a result of S.B. 1, the DST Houston chapter was forced to increase its budget for "voter registration drives and mobilization efforts" to ensure "added training and enhanced education." She also noted that before S.B. 1's enactment, DST was able to focus "100 percent" of its time on voter registration and mobilization, but "[a]fter S.B. 1, probably 50 percent of that time" was now directed toward education efforts.

This is an injury inflicted through the diversion of resources. Consider the numbers that Jones provided: prior to S.B. 1, DST's Houston chapter dedicated about "100 percent" of volunteer hours and budget toward voter registration and mobilization. After S.B. 1, the chapter had to increase its funding for the same functions—and divert half of that budget toward education efforts. That differential, especially when multiplied by the number of DST chapters across Texas, is "more than [the] identifiable trifle" needed to allege an injury. *Fowler*, 178 F.3d at 358 (quotation omitted); *see also OCA-Greater Houston*, 867 F.3d at 612 (finding sufficient injury for an organization that "calibrated its outreach efforts to spend extra time and money educating its members about [updated] Texas provisions," even though that "injury was not large").

The majority dismisses these concerns by asserting that "'[d]iverting . . . resources in response to a defendants' actions' does not establish

standing." *Ante* at 11 (quoting *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024)). But *Alliance* featured a wholly distinguishable resource diversion claim. The medical associations in that case argued that they were injured because they had to expend resources to draft petitions and engage in advocacy against the FDA's mifepristone regulations. *Alliance*, 602 U.S. at 394. The Supreme Court rejected that theory, explaining that an organization "cannot spend its way into standing" by diverting resources to express disagreement with a government's actions. *Id.* The *Alliance* associations' self-inflicted injury is far different from the injury that DST and other organizations have suffered from S.B. 1's implementation.

Instead, DST's injury more closely resembles that suffered by the organization in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *Havens* featured a housing counseling organization ("HOME") that alleged that a landlord's racial steering practices interfered with its counseling services. 455 U.S. at 379. The Court held that HOME's core functions were "perceptibly impaired," and that impairment constituted a cognizable injury. *Id.* And *Alliance* reaffirmed *Havens*, explaining that organizations have standing when a defendant's actions "directly affect[] and interfere[] with [their] core business activities." 602 U.S. at 395.

This court also applied *Havens* in *OCA-Greater Houston*: we held that a nonprofit organization had standing to challenge a Texas law that limited the pool of assistors for voters that had limited English proficiency. 867 F.3d at 612–14. There, the organization asserted, and we recognized, an injury associated with "additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters." *Id.* at 610. The same is true here: DST's mission is to empower the communities it serves through social action. S.B. 1 indisputably interferes with that mission, and has forced DST to expend additional time and effort and marshal financial resources to

continue its activities.  This is a sufficient injury for organizational standing
purposes.

### 2.   LUPE

The district court concluded that LUPE had standing to challenge
the Disclosure Provisions because it struggled to recruit volunteers in the
face of S.B. 1's threatened criminal sanctions.  LUPE's executive director,
Tonia Chavez Camacho, testified that the amendments "frightened" staff
and volunteers and led some to "cho[ose] to no longer" volunteer for fear of
making mistakes and resultant investigation.  Camacho also explained that
the amendments forced its paid staff to turn away members who requested
voting assistance: "how are we going to be helping voters when now we could
be criminalized for doing so?"  Staffing shortages, and the denial of services
to individuals that LUPE used to support, fully constitute perceptible
impairments on the organization's offerings.

The majority casts aside these staffing losses and declares that there
is "no credible threat that any assistors will be prosecuted for violating the
Disclosure Provisions."  *Ante* at 9.  It, without any explanation, overrides
Camacho's testimony in favor of Texas' assertion that any fear is self-
inflicted and dependent "on a 'highly attenuated chain of possibilities.'"  *Id.*
(quoting *Elfant*, 52 F.4th at 257).  But at least with respect to LUPE's
assisting staff members, the likelihood of investigation or prosecution is
substantial because they (1) are compensated and (2) likely have no familial
or caregiver relationship to a voter in need of assistance.  Any assistance
provided by those staff members would violate the Compensation Provisions;
the Disclosure Provisions would identify violating assistors.  And as for the
organization's loss of volunteers, I disagree that the fears of volunteers

constitute "baseless speculation about future prosecutions" for the same reasons discussed in the analysis on the Arc's standing. *Ante* at 10.

### 3.    MABA

The majority's omnibus rejection of standing also applies to MABA. Before the district court, MABA's President, Jana Ortega, testified that the organization was "finding it harder and harder to find members that are willing to educate voters, to reach out to voters, [and] to be more involved in our Get Out the Vote efforts." She specified that when she put out a call for volunteers, "it's crickets." Ortega additionally noted that MABA's members spoke of fears that "anything [] they do or may say to be interpreted as pressuring a voter." As for the impact on MABA's activities, Ortega disclosed that the organization was "trying to stay the same course and maintain the same level of activities, but, again, it is harder and harder to find volunteers."

The majority's conclusion—that MABA's loss of volunteers is not an injury—is particularly striking because Ortega's comments outline the issues with the "pressure" addition to the Oath Provision. The term effectively requires the assistor—under penalty of perjury—to ascertain the effect of her words and actions on the state of mind of another person. That may be possible in some cases—a voter may easily volunteer that they did not feel pressured or coerced. But it is also foreseeable that in other cases, the revised oath amounts to a requirement that an assistor possess substantial confidence in her ability to read the state of mind of the voter she is assisting.

Relatedly, the "pressure or coerce" language fails to provide an assistor with a standard of conduct to which she is certifying compliance. In *Coates v. City of Cincinnati*, for example, the Supreme Court invalidated an ordinance that outlawed conduct that was "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others."  402

U.S. 611, 614 (1971). More recently, the Eleventh Circuit struck, on vagueness grounds, a Florida statute that prohibited "engaging in any activity with the intent to influence or effect of influencing a voter." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944 (11th Cir. 2023). Our sister circuit reasoned that even if the statute defined what "influence" was, that fact did not "bestow the ability to predict which actions will influence a voter." *Id.* at 947. And it noted that "[i]f the best—or perhaps only—way to determine what activity has the 'effect of influencing' a voter is to ask the voter, then the question of what activity has that effect is a 'wholly subjective judgment[] without statutory definition[], narrowing context, or settled legal meaning[].'" *Id.* (quotation omitted).

Especially in the context of criminal statutes, "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted). Testimony elicited during the bench trial confirmed S.B. 1's chilling effect: in addition to the "crickets" that Ortega received in response to volunteer requests, a county elections administrator testified that the "pressure" certification was "vague enough where . . . [assistors] might be concerned that they are going to violate the oath if they signed it." The majority's cursory dismissal of these fears as "puzzling" and insufficient for standing purposes, flies in the face of not only this evidence, but also, vagueness principles. *Ante* at 14.

### 4.    FIEL

Lastly, the majority concludes that FIEL lacks a sufficient injury. During the bench trial, the organization's Executive Director, Cesar Espinosa, testified that as a result of the Oath and Disclosure Provisions, the organization experienced "a significant number in drop-offs for people volunteering to help out with" in-person voter assistance tasks. He

quantified that the loss in volunteers was about 75%: "teams of [twenty-four] dwindled down like … teams of six." Espinosa testified that FIEL's "ability to achieve [its] mission" was so hindered that it did not anticipate organizing any in-person voter assistance efforts because of "dwindling numbers of people who are willing to volunteer." For the reasons discussed above, FIEL's loss in volunteers—to the point where it cannot feasibly continue to organize in-person voter assistance efforts—is a sufficient injury for standing purposes.

Though the district court did not discuss associational standing, FIEL raises the argument as an alternative path. Espinosa testified that FIEL has "members who are disabled and require assistance when voting," and specifically identified Tonya Rodriguez as a member who voted "in person" with an assistant prior to S.B. 1's enactment. According to Espinosa, "after S.B. 1[, Rodriguez] voted in person [] without an assister." For reasons similar to those discussed in relation to the Arc's affected members, FIEL has demonstrated associational standing to press claims against the Oath and Disclosure Provisions.

## V.    Merits

Turning to the merits of S.B. 1, the majority concludes that the Compensation Provisions are not preempted by Section 208 of the Voting Rights Act. I disagree.

### A.    Section 208 and Preemption Framework

In 1965, Congress enacted the Voting Rights Act (the "VRA") to forbid states from enacting laws that abridged the right to vote on the basis of race. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 537 (2013). Nearly twenty years after the Act's passage, Congress expanded its coverage to protect the right to vote among blind, disabled, and illiterate persons. Section 208 of the VRA reads:

> Any voter who requires assistance to vote by reason of
> blindness, disability, or inability to read or write may be given
> assistance by a person of the voter's choice, other than the
> voter's employer or agent of that employer or officer or agent
> of the voter's union.

52 U.S.C. § 10508. The crux of this case is whether S.B. 1 violates Section
208 because it directly regulates—and restricts—a qualified voter's
entitlement to "assistance by a person of [their] choice." *Id.* It does.

First, from a definitional perspective, "choice" means "selection" or
"power of choosing." *Choice,* MERRIAM WEBSTER (online ed., 2025).
Section 208 provides the voter, not the state, with the autonomy to make that
choice. A state that directly limits the pool of assistors from which the
qualified voter selects, infringes on the choice that voter is entitled to make.[26]

Second, the statute already speaks to two restrictions placed on the
voter's choice. A voter cannot select (i) their employer, or an agent of that
employer, or (ii) an officer or agent of their union. "Where Congress creates
specific exceptions to a broadly applicable provision, the 'proper inference
... is that Congress considered the issue of exceptions and, in the end,
limited the statute to the ones set forth.'" *Med. Ctr. Pharm. v. Mukasey*, 536
F.3d 383, 395 (5th Cir. 2008) (original ellipsis, quoting *United States v.
Johnson*, 529 U.S. 53, 58 (2000)). Put differently, "when Congress provided

---

[26] The RNC and Intervenors cast Section 208's text as an opportunity, not an
obligation. It specifically points to the inconclusive articles that the statute is framed in: a
voter "may be given assistance by a person of the voter's choice." 52 U.S.C. § 10508
(emphases added). That invokes one of the definitions of "may"—"used to indicate
possibility or probability." *May*, Merriam Webster (online ed., 2025) (first definition; i.e.,
"We may or may not go to the park today."). But the better definition, and the one that
gives full meaning to the complete sentence and the right it protects, is the second
definition of "may"—"have permission to" or "be free to." *May*, Merriam Webster
(online ed., 2025) (second definition, i.e., "you may go now").

the two exceptions" to one of its statutes, "it created all the keys that would fit. It did not additionally create a skeleton key that could fit when convenient." *Parada v. Garland*, 48 F.4th 374, 377 (5th Cir. 2022) (per curiam). The majority's opinion undermines this basic canon of statutory interpretation.

Third, Congress's intent in passing Section 208 is worth considering. The Senate Judiciary Committee's Report confirms that Congress wanted eligible voters to gain assistance from a person of their own choosing, with two exceptions only. *See generally* S. REP. NO. 97-417 (1982). The Report also speaks in mandatory terms: eligible voters "must be permitted to have the assistance of a person *of their own choice* . . . to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter. To do otherwise would deny these voters the same opportunity to vote enjoyed by all citizens." *Id.* at *62 (emphasis added). And while the majority discards the Report's persuasiveness, arguing that no court has "deemed it authoritative as to Section 208," *ante* at 25, the Supreme Court has "repeatedly recognized that the authoritative source for legislative intent" of the 1982 VRA amendments, including Section 208, "lies in the Committee Reports on the bill." *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986).

The majority instead posits that "a presumption *against* preemption applies in this case" for two converging reasons: (1) S.B. 1 concerns a state's "historic police powers in administering elections," and (2) "preemption here would alter the federal-state balance of power." *Ante* at 18. It summarizes that preemption can exist "only if Section 208 expresses Congress's 'clear and manifest purpose' to do so." *Id.* (quoting *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024)).

But that bar is satisfied here: Congress did intend for the VRA to displace state laws, and the Supreme Court has spoken repeatedly to that

intent. The VRA "authorizes federal intrusion into sensitive areas of state and local policy making," and accordingly "imposes substantial 'federalism costs.'" *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282 (1999) (second citation quoting *Miller v. Johnson*, 515 U.S., at 926). "[P]rinciples of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments," including the Fifteenth Amendment—the constitutional provision from which the VRA derives its constitutionality. *City of Rome v. United States*, 446 U.S. 156, 179 (1980). Simply put, the VRA's "purpose was to create a guaranteed right to the voting process that could not be narrowed or limited by state legislation." *Disability Rts. N. Carolina v. N. Carolina State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *4 (E.D.N.C. July 11, 2022). The majority's contrary approach ignores the robust legislative history and historical significance surrounding the VRA.

## B.    The Compensation Provisions

Turning to the provisions themselves, §§ 6.06 and 7.04 prohibit compensation in exchange for assistance with mail-in ballots (§ 6.06) and in-person interactions in the presence of a ballot (§ 7.04). These provisions are preempted by Section 208 because they restrict the class of eligible assistors beyond the categories prohibited by the statute: employers, union representatives, and their agents. Said otherwise, the Compensation Provisions are not only extratextual, but also "interfere[] with and frustrate[] the substantive right Congress created" under Section 208 of the VRA. *Felder v. Casey*, 487 U.S. 131, 151 (1988).

To rescue the Compensation Provisions, the majority resorts to Texas' rejoinder: the absurdity canon. *Ante* at 19–21. But "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are

available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (citing cases). Moreover, wielding the canon as a cudgel "so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter." *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) (citation omitted). Traditionally, the remedy for "mischievous, absurd, or otherwise objectionable" statutory outcomes "lies with the lawmaking authority, and not with the courts." *Id.*

The canon's utility for S.B. 1 is further diminished when considering the majority's hypotheticals—which it concedes are "absurdity on absurdity." *Ante* at 20. The majority first identifies state laws that prevent election workers and candidates from serving as assistors. *Id.* (citing laws from four states). But those examples comport with Section 208's legislative history: as our caselaw demonstrates, prior to 1982, some states only allowed voters to receive assistance from poll officials. *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 487, 489 (5th Cir. 1970). The Senate Report explains that Congress adopted a different approach—allowing voters to select their own assistors—because "having assistance provided by election officials . . . infringes upon [a voter's] right to a secret ballot and can discourage many from voting for fear of intimidation or lack of privacy." S. REP. NO. 97-417 at *62 n.207. It is telling that Texas, the Intervenors, and the majority cannot offer any authority, textual or legislative, in support of the Compensation Provisions. Candidly, it does not exist.

The majority also suggests that if S.B. 1 was preempted by Section 208, Texas would be powerless to stop a voter from selecting an assistor (1) "carrying a Glock," (2) "holding a candidate's sign," or (3) "in prison." *Ante* at 20. Yet existing restrictions—legal or practical—already prevent such individuals from entering polling places. *See, e.g.*, TEX. PENAL CODE § 46.03(a) (barring firearms at polling places); TEX. ELEC. CODE §

61.003(a), (b)(1) (banning electioneering inside and in close proximity to a voting site); *Arkansas United v. Thurston*, 626 F. Supp. 3d 1064, 1087 (W.D. Ark. 2022), *rev'd on alternative grounds*, No. 22-2918, 2025 WL 2103706 (8th Cir. July 28, 2025) ("And an incarcerated person would not be able [to] assist at the polling place for reasons that are completely unrelated to [a state's] elections laws."). The majority responds to this obvious distinction with flippant sophistry: it "see[s] no difference" because "the latter restricts assistors in precisely the same way as the former." *Ante* at 21 n.17. But the distinction is commonsense: the firearm, electioneering, and prisoner hypotheticals concern general restrictions that prevent an individual from entering a polling place and rendering assistance in the first place. S.B. 1, on the other hand, directly regulates the pool of eligible assistors by tacking on an assistor-exclusive requirement that those individuals must work without compensation.

One final point is worth noting: for all that the majority says about how S.B. 1 is permissible, it says little about what remains of Section 208. At best, it frames Section 208 as a "guarantee[]" for eligible voters to receive "help from a person of their choice, while also allowing states to superintend voter assistance." *Ante* at 21 (cleaned up). But that nebulous statement offers little clarity for voters who need assistance in casting their ballot. The majority's limiting principle is, effectively, "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). That conclusion blinds itself to the purpose of Section 208: ensuring that those less fortunate have access to the assistor of their choice when they elect to engage in our democratic tradition.

*    *    *

I respectfully dissent.